**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TONI MAJER, | ) | CASE NO.    1:09-cv-0836 |
| | ) | |
| Plaintiff, | ) | JUDGE O'MALLEY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| LEXION MEDICAL, LLC, | ) | REPORT AND RECOMMENDATION |
| | ) | Doc. No. 43 |
| Defendant. | ) | |

This case is before the magistrate judge on referral.  Before the court is the

motion of defendant, Lexion Medical, LLC ("Lexion") to dismiss the complaint pursuant

to Fed. R. Civ. P. 12(b)(6) ("R. 12(b)(6)") for failure to state a claim upon which relief

may be granted.  Doc. No. 43.  Plaintiff, Toni Majer ("Majer"), opposes Lexion's motion.

Also before the court is Majer's motion to strike certain evidence filed by Lexion as

inadmissible or improperly introduced.  Doc. No. 64.  Lexion opposes this motion.  Doc.

No. 67.  For the reasons given below, Lexion's motion for summary judgment should be

DENIED and Majer's motion to strike should be dismissed as moot.

I

The court construes the facts, as it must, in the light most favorable to the party

resisting the motion.  Except where otherwise noted, the parties allege, or do not

contest, the following facts.

Lexion produces medical devices for sale to physicians and medical institutions. Lexion's sales representatives sell these devices.  Majer applied for a sales representative position with Lexion in May 2006.  Three regional sales managers ("RSMs") interviewed her for the job:  Mark Jarboe ("Jarboe"), Lori Larson ("Larson"), and Karen Hawthorne ("Hawthorne").  During these interviews, Larson and Hawthorne allege that they told Majer that the success of sales representatives was measured by the new accounts they obtained.  On May 10, 2006, Lexion sent Majer a letter offering her a job as a sales representative and outlining certain terms of her employment.  Deposition of Majer, Exh. 55, Doc. 7.  These terms included her base salary, commission structure, growth requirements, bonus schedule, territory history, and territory projections.  The letter also indicated that Lexion expected Majer to produce $100,000.00 in growth and that this goal must be met before she would earn commissions.

Majer accepted Lexion's job offer.  Lexion gave Majer 1½ days of training, during which she was told that the average learning time for persons without previous medical sales experience was three to four months.  Majer was primarily responsible for selling Lexion's Insuflow device.  Her job included exploring sales leads, cold calling potential buyers in her territory, visiting current users of the Insuflow, finding out why past users were no longer using the device, and, particularly, working in the operating room with physicians to demonstrate how the device was used.  Majer worked with Hawthorne or Jarboe on five occasions to help her learn how to market and demonstrate the Insuflow. She also worked with or shadowed other successful sales representatives to learn how they worked to sell the device.  In addition, Majer received tips and leads from the

2

RSMs regarding how to support current customers, how to find and research new customers, and where likely sales could be found.

Majer had regular feedback regarding her sales status and performance.  All sales representatives, including Majer, received bi-monthly sales reports that summarized the status of ongoing accounts, new sales, and progress toward sales goals.  Once a month, sales representatives also received commission statements. These statements summarized the representative's sales each month in dollar amounts, whether the representative was meeting sales goals, and whether the representative had any bonus accounts.  Majer secured her first new account in August, 2006.  She did not meet her goals for new sales in any month in which Lexion employed her.

Majer contends that she received consistently positive communications from Hawthorne during 2006.  Majer cites these communication as examples of positive communications:

- June 7, 2006, e-mail message, "love, love, love": "WOW… This visit to Cleveland has completely reinforced why we chose you as THE candidate."15

- August 7, 2006 "Your success": "You are doing a great job networking and putting things together in your territory. . . . Keep up the great attitude and determination. Your first new account is just around the corner!"

- August 21, 2006 "Follow Up 8-21-06": "It looks like things are beginning to take shape for you… again, congratulations on securing your first new account! It is very apparent that you have been hitting the pavement and have been making many connections within the community . . . . The connections you have made thus far are working for you. Keep up the great work!"

- October 3, 2006, "October is your month!": "I can feel it."

- October 6, 2006, "thanks": "for keeping your expenses in check. Love it!"

3

Opposition Brief at 2-3 (footnotes omitted).

On January 5, 2007, Majer received the following e-mail from Hawthorne accompanied by an attachment describing Majer's 2007 Compensation Plan:

> Toni--Congratulations on a successful 2006!  We are looking forward to accelerating the pace for 2007 and we are confident that this will be your break out year!  Remember, because of your start date in 2006, you are eligible for Rookie of the Year 2007.  We have attached your 2007 Comp Plan with this email.  Please let us know if you have any questions.  Good luck in 2007!
>
> P.S. We have determined your compensation for 2006 as $35,077 (regular pay, holiday pay and PTO from hire date- Dec.30th) plus $5,194.80 in commission to equal $40,272.  This does not include your new account bonuses of $1,500.00 which would bring a grand total of $41,772.  During a full calendar year this equates to $66,695.)
>
> 2007 Benefits enclosed also.

Deposition of Majer, Pt. I, Exh. 50 (punctuation in original).  The attached commission plan indicated that Majer had achieved $20,627 of new growth in 2006, about 20% of the goal that had been set for her.  It also projected new account growth for 2007 as $150,000.00.  Such growth, when combined with existing accounts, would have resulted in $380,633.00 of total sales for 2007, or about $27,655.00 per month, with old accounts representing almost $17,000 of that number.

According to Lexion, two questions from Majer in January 2007 indicated to Hawthorne that Majer was having difficulty understanding basic concepts and procedures related to the Insuflow.  Hawthorne and the other RSMs began discussing concerns regarding Majer's performance.

Majer's sales figures for January and February 2007 were $19,995.00 and $18,159.00, respectively.  Deposition of Majer, Exh. 103.  A handwritten note from the end of February 2007 indicates that Majer understood that she needed total sales of

4

$27,535.00 per month during 2007 to meet her sales goals.[1]  Deposition of Majer, Exh. 104, p. 3.

Majer continued to receive training from Hawthorne.  In March, Hawthorne told Majer that she needed to spend less time in the office and more time in the operating room and that she needed to take a more focused approach to her leads.  Majer failed to follow up on an in-service call she made with Hawthorne, despite Hawthorne's directive to do so.

On April 27, 2007, Jarboe sent an e-mail to all territory sales representatives naming the top two sales representatives on the basis of sales for the first quarter of 2007.  Deposition of Majer, Exh. 63.  The e-mail also gave each representative a ranking out of 21.[2]  Majer's ranking was 18th.  Lexion alleges that only new sales representatives ranked lower than Majer.

On May 2, 2007, Hawthorne e-mailed all her sales representatives, asking them to provide examples of what they say when trying to promote Insuflow, without sounding "clinical."  On May 11, 2007, having received Majer's response to the e-mail, Hawthorne e-mailed the following to Majer:

> Toni- This is exactly right.  However, . . . we want to work on "casual lingo."  This response sounds very scripted . . . right from the textbooks.  Can you re-read the comments that are going around and see the difference between those and this?
>
> The casual lingo we are referring to seems to be better received by the nurses

---

[1]  As noted earlier, the attachment to Majer's January 5, 2007 e-mail gave the monthly goal as $27,655.00.  The relatively minor discrepancy between that figure and the figure that Majer jotted down at the end of February is not explained in the record.

[2]  A handwritten note on the copy of the e-mail in the record indicates that the proper number is 22.  The author of the note is unknown.

and drs because they can truly relate to it.  And those who are using it in the field are having more success.

Try to work on your casual lingo and begin incorporating it into your sales calls instead of the mechanical answers which can come across as monotone and uninteresting.

Your audience will be more engaged, entertained, and more passionate about the Insuflow benefits which will lead to more sales.

Let me know if you have questions regarding where we are going with this . . . thanks.

Deposition of Majer, Exh 68.

On May 17, 2007, Hawthorne and Majer discussed two studies related to recovery time and reduction of bowel obstruction.  Four days later, Majer e-mailed Hawthorne asking for the same information that the two had reviewed on the 17th.  After an additional e-mail from Majer indicating that she was unclear about the studies, Hawthorne e-mailed in relevant part:  "Toni, You should know the Ott one by heart…. And know the key points….! After you get home and have internet access, re-read the Ott[3] study from 1999…"  Deposition of Hawthorne, Pt. II, Doc. No. 58, Exh. OOO. Lexion contends that these exchanges show that Majer apparently did not understand studies she had first been given a year earlier.  Deposition of Hawthorne, Pt. II at 192-94.

From May 22, 2007 through May 24, 2007, Majer attended field training with Mike Kirkpatrick ("Kirkpatrick"), a Michigan sales representative.  Upon completion of the training, Majer told Hawthorne that she was doing everything that Kirkpatrick had done and that she had not learned anything new.  Kirkpatrick, however, reported to

---

[3]  Douglas E. Ott was Lexion's medical director.

Hawthorne and Jarboe that Majer was not confident when talking about the Insuflow to an audience.  Kirkpatrick said that she was flustered when talking to surgeons, was hesitant, had many questions, and apparently did not grasp the selling points of the Insuflow.  Kirkpatrick had been hired one month after Majer.

During the training with Kirkpatrick, Hawthorne and Majer exchanged e-mails.  In one of the e-mails, Majer expressed confusion about the term "4 arms of 11," meaning four groups of patients.  Lexion alleges that because of this, Hawthorne became concerned that Majer did not know what the term meant, as is was one that was frequently used and to which Majer had been introduced a year earlier.

Hawthorne, Jarboe, and Larson allege the following.  On May 24,[4] 2007, the RSMs conferred regarding Majer.  They discussed ending Majer's employment, something that they had discussed previously. Among other things, they reviewed the following information regarding Majer's sales performance compared to her sales goals:

| Month | Goal | Sales Performance |
|-------|------|-------------------|
| July 2006 | $25,833.33 | $12,798.00 |
| August 2006 | $25,833.33 | $23,400.00 |
| September 2006 | $25,833.33 | $15,069.00 |
| October 2006 | $25,833.33 | $16,914.00 |
| November 2006 | $25,833.33 | $18,828.00 |
| December 2006 | $25,833.33 | $23,514.00 |
| January 2007 | $27,552.75 | $19,995.00 |

---

[4]  The date may have been May 23, 2007.  Testimony about the exact date is contradictory.

7

| February 2007 | $27,552.75 | $18,159.00 |
| March 2007 | $27,552.75 | $21,153.00 |
| April 2007 | $27,552.75 | $17,793.00 |
| May 2007 | $27,552.75 | $25,056.00 |

Deposition of Majer, Exh. 103 at 1, 8.[5]  They also noted that Majer had lost some previously-established business, had difficulty with basic concepts related to the Insuflow, and was not spending enough time in the operating room.  Consequently, they decided to terminate Majer.  They also decided to continue her through the second quarter, with an effective termination date of July 10, 2007.  After this discussion, the RSMs allegedly telephoned Shelly Amann, their supervisor, and, later, Dr. Ott, Lexion's medical director regarding their decision to terminate Majer.

Majer did not attend a conference call scheduled for May 30, 2007.  On June 15, 2007, Hawthorne and Majer participated in a conference call during which Hawthorne told Majer that she had not improved her sales performance.  On June 18, 2007, Majer telephoned Hawthorne and told her that she had sprained her ankle over the weekend and that she was pregnant.  Hawthorne alleges that she congratulated Majer on her pregnancy; Majer alleges that Hawthorne did not congratulate her.  Instead, according to Majer, Hawthorne noted that another sales representative had also said that she was pregnant and asked, "What are we going to do about that?"

---

[5]  Plaintiff erroneously objects to the use of the chart as "evidence."  The chart is not evidence.  The citations accompanying the chart in Lexion's brief, including the citations to Deposition of Majer, Exh 1, are evidence for the veracity of the numbers in the chart. Whether those numbers are expressed in Lexion's brief as paragraphed text or as a chart is an irrelevancy.

8

On June 26, 2007, Hawthorne completed Majer's separation notice.  Majer's sales numbers for June 2007 were $14,448.00, an amount more than $13,000.00 below her sales goal.  Majer had not used an Insuflow sample during the month of June. Majer's sales for the first half of 2007 were $116,604.00, reflecting a decrease from her sales in the last half of 2006, $129,882.00.

Hawthorne and Majer met on July 10, 2007 in Westlake, Ohio.  Hawthorne told Majer that her employment was not working and that she was being terminated. Hawthorne collected the property Lexion had given Majer, including a laptop computer and a car, and arranged for a car to bring Majer home.

According to Hawthorne, when she returned to the office, she found a number of personal items that had been left in the case containing the laptop.  These included note pads, pens, paper clips, rubber bands, and two packets of pills.  Hawthorne testified that the pills had Majer's name and address on them and that four or five pills on one of the packages had been punched out.  She told Katie Pavleck ("Pavleck") to send them to Majer.  Pavleck sent them to Majer by Federal Express with an enclosed note, "Karen wanted me to send you these.  Thanks, Katie."  Hawthorne also testified that Majer had told her earlier that she had been using birth control pills until she decided to become pregnant.  Majer later produced birth control pills she alleged she had received in the mail from Lexion, but those pills were identified as belonging to Jian Tang ("Tang"), and the prescription had been filled at a pharmacy in Avon Lake, Ohio.  Tang flew out of Cleveland on July 10, 2007 on the same flight that Hawthorne had taken to leave Cleveland.  The pills had been placed in an outer pocket of her backpack which, like Hawthorne's computer case, had been "gate checked" before boarding the flight.  Tang

9

testified that both of her packages of pills had been full.  Hawthorne denied that the pills produced later by Majer were the pills she had asked Pavleck to send to Majer.

On July 18, 2007, Majer's attorney sent Lexion a letter advising it of Majer's claims and protesting what counsel believed to be harassment directed at Majer by sending the birth control pills to her.  Majer filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 10, 2007, alleging gender and pregnancy discrimination.  Majer received a right to sue letter from the EEOC on December 3, 2008.

On February 26, 2009, Majer filed this action against Lexion in state court. Lexion removed the case on April 13, 2009.  Majer alleges impermissible gender and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k).  Lexion now moves for summary judgment.

II

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56. The moving party can meet this burden in two ways: by presenting sufficient evidence to indicate there is no genuine issue of material fact; or by arguing the non-moving party, after adequate time for discovery, has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but must set forth through

10

competent and material evidence specific facts showing that there is a genuine issue for trial.  *See Cox v. Kentucky Department of Transportation*, 53 F.3d 146, 149 (6th Cir. 1995).  The nonmoving party may oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves. . . ," *id.*, or by any other evidentiary material admissible at trial.  *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993); *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, 10A, § 2721 (1998).  Conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes.  *Lujan v. National Wildlife Fed'n*, 497 U.S. 871 888-89 (1990).

The trial court has no "duty to search the entire record to establish that it is bereft of a genuine issue of material fact."  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989).  That is, the nonmoving party has an affirmative duty to direct the court's attention to specific evidence upon which it seeks to rely.  *Al-Qudhai'een v. America West Airlines, Inc.*, 267 F. Supp.2d 841, 845 (S.D. Ohio 2003) (citing *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001)).  The lack of such a response by the nonmoving party may result in an automatic grant of summary judgment.  *Reeves v. Fox Television Network*, 983 F.Supp. 703, 709 (N.D. Ohio 1997).

When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to . . . the party opposing the motion . . . ."  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *see also Aetna Ins. Co. v. Loveland Gas & Elec. Co.*, 369 F.2d 648 (6th Cir. 1966).  In addition, the Court "does not weigh the evidence or make credibility determinations."  *Id*. This includes taking the nonmoving party's uncontradicted allegations as true and giving

11

the benefit of the doubt to the nonmoving party's assertions when they conflict with

those of the movant.  *Bishop v. Wood*, 426 U.S. 341 (1976); *Bosely v. City of Euclid*,

496 F.2d 193, 197 (6th Cir. 1974).  However, "the mere existence of a scintilla of

evidence in support of the [non-moving party's] position will be insufficient; there must

be evidence on which the jury could reasonably find for the [non-moving party]."

*Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986).  In other words, the court

should determine "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a matter

of law."  *Id.* at 251.

III

Majer alleges that Lexion discharged her because of her pregnancy in violation of

Title VII as amended by the PDA.  Title VII bars employers from discriminating against

employees on the basis of gender.  Congress amended Title VII in 1978 by passing the

PDA, which provided in relevant part as follows:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to,
> because of or on the basis of pregnancy, childbirth, or related medical conditions;
> and women affected by pregnancy, childbirth or related medical conditions shall
> be treated the same for all employment-related purposes, including receipt of
> benefits under firing benefit programs, as other persons not so affected but
> similar in their ability or inability to work.

42 U.S.C. § 2000e(k) (1994) (emphasis added).  Thus, the PDA prohibits distinctions

based on pregnancy or potential pregnancy sex discrimination within the meaning of

Title VII.  *Ensley-Gaines v. Runyon*, 100 F.3d 1220, 1224 (6th Cir. 1996).

A plaintiff may establish a *prima facie* case of discrimination by presenting direct

evidence of discrimination.  "[D]irect evidence is that evidence which, if believed,

12

requires a conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 446, 470 (6th Cir. 2005).

When plaintiff presents no direct evidence of discrimination, courts analyze cases alleging pregnancy discrimination by using the burden-shifting framework first described in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973), and *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981).  *Ensley-Gaines*, 100 F.3d at 1224.  Plaintiff has the initial burden of proving a *prima facie* case of discrimination. To establish a prima facie case of discrimination, the plaintiff may provide direct or statistical evidence of discrimination.  Otherwise, plaintiff may establish a *prima facie* case by showing that "1) she was pregnant, 2) she was qualified for her job, 3) she was subjected to an adverse employment decision, and 4) there is a nexus between her pregnancy and the adverse employment decision."  *Cline v. Catholic Diocese of Toledo*, 206 F. 3d 651, 658 (6th Cir. 2000)

If plaintiff successfully produces evidence sufficient to establish a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  If defendant is able to offer such a reason, the burden of production shifts back to the plaintiff to demonstrate that this reason is a mere pretext for discrimination.  *Id.*  While the burden of production shifts from party to party, the ultimate burden of persuasion remains with the plaintiff.  *Equal Employment Opportunity Comm'n v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 834 (6th Cir. 1997)

In the instant case, Majer contends that the mailing of birth control pills to her is

13

direct evidence of discrimination.  Majer errs.  "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Kocak v. Cmty. Health Partners of Ohio, Inc.,* 400 F.3d 466, 470 (6th Cir. 2005).  It is entirely possible to believe that Hawthorne caused the pills to be sent to Majer without concluding that Majer was fired, at least in part, due to a discriminatory motive.  For example, Hawthorne may either have given the matter no thought and sent the contents of the case to Majer reflexively or assumed that the pills were old but still Majer's property.  Sending the pills to Majer does not necessarily evidence a desire by Hawthorne to discriminate.

Having failed to offer direct evidence of discrimination, Majer must use the burden-shifting framework to establish a *prima facie* case of discrimination.

The parties agree that Majer was pregnant and, therefore, a member of a protected class.  They also agree that she suffered an adverse employment action by being fired.  Lexion argues, however, that Majer was not qualified for her position and that Majer is unable to show a nexus between her pregnancy and her firing.  Majer challenges both these assertions.

In determining whether an individual is qualified for her position, a court must avoid conflating the legitimate, non-discriminatory reasons for the adverse employment action articulated by defendant with the question of whether plaintiff was qualified. *Cicero v. Borg-Warner Auto., Inc.,* 280 F.3d 579, 584 (6th Cir. 2002).  Thus, for purposes of analyzing whether plaintiff has established a *prima facie* case, the court should consider only whether the plaintiff was meeting the employer's expectations prior to and independent of the events that defendant alleges were the cause of the adverse

14

employment action.  *Tysinger v. Pilce Dep't of Zanesville*, 463 F.3d 569, 573 (6th Cir.

2006) (citing *Cicero,* 280 F.3d at 585, and *Cline v. Catholic Diocese of Toledo,* 206 F.3d

651, 662-63 (6th Cir. 2000)).  If an employer contends that the employee never met the

employer's expectations, the plaintiff may show merely that she satisfied the employer's

"objective" qualifications to demonstrate that she was qualified for the position.  *Upshaw*

*v. Ford Motor Co*., 576 F.3d 576, 585 (6th Cir 2009).

Lexion concedes that it hired Majer for the position of sales representative.

Lexion argues, however, that Majer was not qualified for her position because she did

not satisfy Lexion's expectations for growing her territory and did not gain the expected

understanding that she needed to perform her job adequately.  However, as these are

the legitimate, non-discriminatory reasons that Lexion gives for terminating Majer, the

court may not consider these reasons in assessing whether Majer was qualified for the

position as sales representative.  Moreover, as Lexion argues that Majer failed to meet

her goals for growing her territory from the first month she was employed at Lexion,

Majer need merely show that she satisfied Lexion's objective hiring qualifications to

demonstrate that she was qualified for the position of sales representative.

Neither Lexion nor Majer offers evidence regarding Lexion's objective hiring

qualifications for sales representative.  Majer argues, however, that the three RSM's

reviewed her resumé, which disclosed previous sales experience, and interviewed her

more than once in person and by telephone before offering her the job.  She concludes,

therefore, that she must have been qualified for the position when Lexion hired her.

Lexion does not counter this argument by presenting its objective hiring qualifications

and showing how Majer failed to meet them.  Having failed to counter Majer's argument,

15

the court concludes that Majer was qualified for the position of sales representative
when Lexion hired her.

Lexion also argues that Majer cannot establish a nexus between Majer's
pregnancy and her termination.  Majer contends that the brief period between the date
on which she told Hawthorne she was pregnant, June 18, 2007, and the date on which
Hawthorne filled out Majer's separation notice, June 26, 2007, is sufficient to show that
the two events were causally linked.  In the Sixth Circuit, the passage of eight days
would be sufficient, of itself, to permit a jury to find a causal nexus between the two
events.  *See Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 525 (6th Cir. 2007)
(finding that temporal proximity alone is sufficient to establish a causal nexus between
discovery of information that may motivate discrimination and an adverse employment
action), and *Goller v. Ohio Dept. of Rehab. & Corr.*, 285 Fed. App. 250, 257 (6th Cir.
2008) (finding a period of one month sufficient of itself to establish a causal nexus).
Lexion answers that Hawthorne and the other RSM's made the decision to terminate
Majer before learning of Majer's pregnancy.  Lexion concludes, therefore, that Majer
cannot show that there was a causal nexus between her pregnancy and the adverse
employment action.

In support of its assertion that the decision to terminate Majer had been made
before learning of Majer's pregnancy, Lexion offers the depositions of Hawthorne,
Larson, and Jarboe.  Hawthorne testified that the three RSMs decided to terminate
Majer during a teleconference on May 24, 2007.  Deposition of Hawthorne, Pt. II at 265-
67.  She also testified that the three had discussed the termination as early as March,
but they wanted to see additional sales numbers before making the decision.  *Id.* at 265-

16

66.  Larson testified that the three RSMs had decided to terminate Majer in May for poor performance and that this decision had been made before learning of Majer's pregnancy.  Deposition of Larson, Doc. No. 53, pp. 26-27.  Jarboe testified that the three had previously discussed terminating Majer for poor performance before actually terminating her for that reason.  Deposition of Jarboe, Doc. No. 52, pp. 33-34.  Jarboe did not say when the decision to terminate Majer was made nor whether the decision occurred before or after learning of Majer's pregnancy.  Lexion also offers a copy of Hawthorne's electronic calendar for May 24, 2007, with the notation at 4:30, "conf call re Toni w/MJ & LL."  Deposition of Hawthorne, Exh. UUUUU, p. 2.  Lexion also submits copies of the telephone records of Hawthorne and Larson, showing a 2-minute call made on Hawthorne's phone at 4:42 p.m. on May 24, 2007 and a 4-minute call on Larson's phone at 6:10 p.m. on the same day.  Defendant's Motion, Declaration of Jessica L. Roe ("Roe"), Exh. F.  According to Lexion, the first call was made to Amann, to tell her that the meeting of the RSMs was about to begin, and the second was to Dr. Ott.[6]

Majer replies to the evidence presented by Lexion as follows:  (1) the depositions are not credible because they contain self-serving testimony; (2) the telephone records do not demonstrate anything about the content of the telephone calls; and (3) there appears to have been tampering with Hawthorne's electronic calendar.  Majer bases the latter allegation on the fact that a second page from Hawthorne's calendar in the same

---

[6]  Handwritten notes on the records identify the first call as made to Amann and the second as made to Ott, but the author of those notes and the basis for the author's comments are not identified.

17

exhibit show sales representative Pete Dunn as resigning on February 1, 2007, whereas several other documents in the record show that he resigned on February 1, 2008. Majer's conclusion is that such an error could have occurred only by adding the notation of Dunn's resignation after the fact.  According to Majer, this creates doubt regarding the accuracy of Hawthorne's calendar.

Given the need to assess the credibility of the witnesses, the slight support of the telephone records, the doubts cast on the accuracy of Hawthorne's calendar, the lack of contemporaneous documentary evidence pertaining to the substance of the May 24th meeting and the fact that the separation notice was not prepared until after Hawthorne learned of Majer's pregnancy, the determination as to when Lexion decided to terminate Majer is a question of fact for the jury to decide.  As the court must view the evidence in the light most favorable to the party resisting the motion for summary judgment, the court's analysis must assume that Lexion did not decide to terminate Majer until after Majer informed Hawthorne of her pregnancy.  These facts, viewed in a light most favorable to Majer, are sufficient to demonstrate a causal nexus between Majer's pregnancy and her termination.  For purposes of this motion, then, Majer has established a *prima facie* case of discrimination.

Lexion offers as its legitimate, non-discriminatory reason for terminating Majer her failure to perform adequately as a sales representative.  Lexion cites a variety of factors as leading to its conclusion that Majer proved inadequate in her job, but primarily points to Majer's consistent inability to meet her sales goals.  As already noted, the RSMs allegedly considered the following information in deciding to terminate Majer:

18

| Month | Goal | Sales Performance |
|---|---|---|
| July 2006 | $25,833.33 | $12,798.00 |
| August 2006 | $25,833.33 | $23,400.00 |
| September 2006 | $25,833.33 | $15,069.00 |
| October 2006 | $25,833.33 | $16,914.00 |
| November 2006 | $25,833.33 | $18,828.00 |
| December 2006 | $25,833.33 | $23,514.00 |
| January 2007 | $27,552.75 | $19,995.00 |
| February 2007 | $27,552.75 | $18,159.00 |
| March 2007 | $27,552.75 | $21,153.00 |
| April 2007 | $27,552.75 | $17,793.00 |
| May 2007 | $27,552.75 | $25,056.00 |

Deposition of Majer, Exh. 103 at 1, 8.[7]  According to Lexion, the ability to grow sales was the primary measure of a sales representative's performance.  Majer's failure to meet her goals for sales growth at any time during her tenure with Lexion, the company concludes, was the reason she was terminated.

Majer asserts that Lexion's reasons for terminating her are false and pretextual.[8]

---

[7]  Also as noted earlier, the RSMs allegedly considered Majer's loss of previously-established business, difficulty with basic concepts related to the Insuflow, and insufficient time spent in the operating room.

[8]  Majer also contends that Lexion has fabricated evidence to support a claim that Majer performed poorly.  According to Majer, on June 20, 2007, two days after Majer told Hawthorne that she was pregnant, "Hawthorne began scrutinizing Majer's performance by printing out old e-mail messages and writing critical notes on them."  Opposition Brief at 28.  This, according to Majer, constitutes an attempt to fabricate evidence to support a claim that Majer was performing poorly and justify the decision to fire Majer.  Lexion responds

19

Majer asserts that she reached 74.4% of her sales goals in 2006, and that this performance was better than the performance of all other sales representatives reporting to Hawthorne.  In support of these claims, she cites three documents:  the letter of January 5, 2007 describing her compensation plan for the coming year; a report ranking sales representatives from June 1, 2006 through April 30, 2007; and a month-by-month summary of Majer's total sales.  Deposition of Hawthorne, Pt. I, Doc. No. 57, Exhs. M, X, Y.  Majer contends that this performance was better than that of Tim Wilson ("Wilson"), Mike Kirkpatrick ("Kirkpatrick"), and Christine Spearman ("C. Spearman"), Hawthorne's other sales representatives.

Lexion objects that the 74.4% figure was reached only by including sales from old accounts established before Majer became the sales representative for her territory.  That is, Majer calculated the total number of sales expected to come from her territory in 2006, $310,008.00, then combined sales from both old accounts and new accounts that she had established, which totaled $230,633.00.  According to Lexion, the true measure of Majer's performance is that she had a goal of $100,000 worth of new sales for 2006 and she achieved only $20,627.00 in new sales.  That is, Majer achieved only about 25% of her sales goal, not 74.4%.  Lexion supports its assertion that sales

---

that most of the e-mails and accompanying hand-written notes were printed in July, after Lexion had received a letter from plaintiff threatening legal action.  While this may be true, it does not explain the e-mails printed and annotated in June and early July. Nevertheless, as the court has not considered any of the notes that Hawthorne wrote on the printed e-mails in reaching its determination regarding Lexion's motion for summary judgment, the nature of those comments is not relevant in determining whether to grant Lexion's motion.

In addition, Majer contends that Lexion destroyed evidence by wiping the hard drive on Majer's laptop computer.  Lexion contends that it preserved the data on the hard drive and told this to Majer.  Majer provides no evidence to support her assertion.

representatives were judged on the basis of new sales by citing three documents. The first is Majer's handwritten notes of an interview with Hawthorne on May 9, 2006, which includes this notation: "Jan 1 -- WANT NEW BUS/ACCOUNTS." Deposition of Majer, Exh. 5. p. 2. The words in capital letters are the only block of text in the 2¼ pages of notes in capital letters. The second is the May 10, 2006 offer letter to Majer indicating that Lexion expected Majer to produce $100,000.00 in growth in 2006 and that this goal must be met before she would earn commissions. The third is the e-mail from Jarbo in April 2007 that Majer ranked 18th of 21 sales representatives.[9] Majer concedes that she understood that her sales growth goal for 2006 was $100,000 in new sales. Plaintiff's Responses to Defendant's First Set of Admissions to Plaintiff, Lexion's Motion, Exh. H, p. 2.

Lexion also disputes that Majer was the best-performing of Hawthorne's sales representatives in 2006. According to Lexion, only C. Spearman had lower 2006 sales than Majer, when looking only at new growth.[10] Lexion asserts that Wilson had $57,300 in new sales in 2006. Wilson 2007 Compensation Plan, Affidavit of Hawthorne, Exh. A. Lexion asserts that Kirkpatrick's sales were higher than those of Majer, but provides no supporting details or evidentiary support for this assertion.

---

[9] Lexion also references a page from Majer's deposition in which she uses the words "focus on growth" as indicating that she understood that growth was the prime factor by which performance would be measured. *See* Deposition of Majer at 78. The meaning of "focus on growth" in context, however, does not clearly support the point for which Lexion wants to use it.

[10] Lexion cites C. Spearman's 2007 Compensation Plan, Affidavit of Hawthorne, Exh. A, attached to Lexion's Reply Brief, Doc. No. 62, in support of this assertion. That document shows that C. Spearman not only failed to achieve any new sales in 2006, but actually lost more than $13,000 in previous accounts that year.

Majer also contends that Lexion's reasons for terminating her are pretextual because Lexion did not terminate other sales representatives who reported to Hawthorne and performed more poorly than she and were not pregnant.  Majer cites C. Spearman, Wilson, and Kirkpatrick as examples of this disparate treatment.

Lexion responds that other sales representatives under Hawthorne who performed poorly also were terminated.  Lexion terminated Wilson in 2008 after a poor performance in 2007.  Lexion asserts that although C. Spearman was not terminated, she was moved out of sales due to poor performance.[11]  Majer describes this move as a promotion; Lexion describes it as a lateral move.  Again, Lexion fails to respond to Majer's allegations regarding Kirkpatrick.

Finally, Majer also alleges Lexion did not terminate sales representatives who reported to Jarboe and Larson and who performed more poorly than Majer.  Majer's specific allegations are as follows:

> Sales reps who reported to Larson also performed worse than Majer in 2006, yet were not terminated.  Michael Kutz and Eric Miller finished at 55.67% and 60% to goal, respectively. Kutz was not terminated until April 2009, and Eric Miller left voluntarily in July 2007.  Jarboe's reps likewise performed below Majer: (1.) Ralph DiCesare, 53% to goal; (2.) Mark Miller, 37% to goal; and (3.) Joshua Schatteman, 55.6% to goal.  Mark Miller and Josh Schatteman left Lexion voluntarily, while Ralph DiCesare remains employed to this day.
>
> The most egregious example of poor sales, for both 2006 and 2007, has to be Pete Dunn, who started in March 2006, before Majer, yet finished 2006 at an abysmal 26% to goal.  ***In 2007, at the end of first quarter, Dunn's sales were 12.59% to goal, a full three percentage points lower than Majer's***.  Dunn never recovered, and finished 2007 at 67.72% to goal, less than Majer's 74.4% from 2006.  Despite these numbers, Pete Dunn was never disciplined or terminated; he left Lexion voluntarily in February of 2008.

---

[11] Lexion also notes that C. Spearman is the daughter of Lexion's president and part owner, Patrick Spearman.

Opposition Brief at 20-21 (emphasis in the original) (footnotes omitted).

Lexion responds, first, that Majer is again improperly using numbers that combine sales from old accounts with sales from new accounts in assembling her statistics.  Lexion also notes that sales representative Amy Norwood ("Norwood") was pregnant at the same time as Majer.  Her new sales results for 2007 were the best of all the sales representatives, and she was named Rookie of the Year.  She still works for the company.  Thus, Lexion concludes, pregnancy is not the issue in gauging performance at Lexion, and the issue is new sales.

Lexion further contends that the document Majer uses to compare her performance to that of other sales representatives, attached to the Deposition of Hawthorne as Exh. M, should not be used for that purpose, as Lexion prepared the document for the EEOC investigation and the document is not completely accurate. Lexion also asserts that the document improperly conflates old sales and new sales and, therefore, is not a proper gauge of sales performance.  But Lexion fails to explain why a document it prepared as part of the EEOC investigation should be inaccurate. Moreover, the document combines old and new sales in columns headed "2006 Sales ending 12/31/06," "2006 % to Goal ending 12/31/06," "2007 Sales ending 3/31/07," and "2007 % to Goal ending 3/31/07."  The conflict between this document and the various Compensation Plans regarding what constitutes "sales goals" at Lexion is made more acute because Lexion avers that no sales representative was to receive commissions until he or she achieved the new growth achievement goal set for that year.  Yet, although Majer failed to achieve her new growth goal, she received commissions for her work in 2006, as described in her 2007 Compensation Plan.  In addition, *the chart that*

23

*Lexion itself uses in its brief to display Majer's performance over time itself conflates old and new sales.*[12]  Lexion cannot be heard to claim the Majer errs in using such data to measure her performance when Lexion itself uses precisely that data to measure Majer's performance.

Moreover, Lexion fails to reply fully to Majer's allegations that many sales representatives were treated differently than she.  Lexion merely asserts that Majer is using the wrong measure to determine how successful each representative was.  It does not continue by using the proper measure to demonstrate that, in fact, relative growth in sales explains whether sales representatives were rewarded or punished.  Absent such a demonstration, Lexion cannot meet its burden of showing that it is entitled to judgment as a matter of law.

Lexion's asserted reason for firing Majer is called into question from a comparison of the treatment accorded those sales representatives, including Majer, who reported to Hawthorne.  Majer cites Wilson, C. Spearman, and Kirkpatrick as sales representatives reporting to Hawthorne whose sales were worse than her sales but were not fired.  Lexion agrees that Wilson's sales were poor in 2007, but asserts that it terminated Wilson in 2008.[13]  Lexion also agreees that C. Spearman's sales were worse than Majer's.  It claims that it moved C. Spearman out of sales for this reason, and it implies that C. Spearman was not fired because she was the daughter of the

---

[12]  The information in that chart is reproduced on page 19 of this opinion.

[13]  Although Wilson was hired after Majer, the termination of Wilson more than six months after the termination of Majer offers marginal, if any, support for Lexion's contention that Majer was fired in July of 2007 for reasons unrelated to her pregnancy.

24

Company's president and part-owner.  Lexion calls her transfer a lateral move; Majer

calls it a promotion.  Lexion says nothing about Majer's allegations regarding

Kirkpatrick.[14]  Lexion's undisputed evidence is insufficient to establish, as a matter of

law, that Lexion's avowed legitimate reason for firing Majer was not pretextual.[15]

Moreover, Majer's allegation that Hawthorne failed to congratulate her on her

pregnancy raises additional questions about pretext.  Indeed, Majer alleges that rather

than congratulating her, Hawthorne noted that another sales representative was also

pregnant, and Hawthorne asked, "What are we going to do about that?"  In a similar

case, the Sixth Circuit wrote as follows:

---

[14]  Lexion's silence regarding Kirkpatrick is particularly problematic because Lexion relies on an affidavit from Kirkpatrick as the only eyewitness to Majer's performance as a sales representative, other than Hawthorne and Jarboe, to support its contention that Majer was a poor salesperson.  *See* Kirkpatrick Affidavit, Motion for Summary Judgment, Exh. 2.

[15]  Lexion points to its treatment of Norwood, who was pregnant at the same time as Majer, as evidence that pregnancy played no role in how it treated its sales representatives.  Despite her pregnancy, Norwood won Rookie of the Year honors in 2007 because of her sales performance.  But Norwood did not report to Hawthorne.  If, indeed, all three RSMs contributed equally to all decisions regarding termination, to whom Norwood reported would matter relatively little.  Majer has cast doubt, however, on the credibility of the three RSMs regarding their decisionmaking process.  Issues of credibility are not resolvable on summary judgment.  *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) ("In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited.").  Consequently, issues involving the nature of the decisionmaking process by which Lexion terminated sales representatives must be resolved by the trier of fact.

Moreover, after learning of Majer's pregnancy and noting that another sales representative was also pregnant, Hawthorne's alleged comment, "What are we going to do about that?," could be interpreted to mean that Hawthorne believed that Lexion had at least one pregnant sales representative too many.  Thus, that Lexion decided to retain Norwood because of her superlative performance might be regarded giving Lexion added incentive to terminate Majer, the pregnant sales representative who was not performing as well as Norwood.  This, of course, is a factual question for a jury.

The . . . more difficult question here is whether Asmo presented sufficient evidence to show that the reasons Keane gave for her termination were pretextual.  The district court found that Asmo failed to provide such evidence after Keane gave a legitimate non-discriminatory reason for terminating Asmo's employment.  While this issue is not clear-cut, we ultimately disagree with the district court and find that under summary judgment standards, there was sufficient evidence to show pretext.

The most significant evidence showing pretext is Santoro's conduct after Asmo announced she was pregnant with twins.  In October 2001, Asmo, Santoro and the entire SG & A team were participating in a conference call, during which Asmo informed the team that she was pregnant with twins.  The news was met with congratulations from all her colleagues except Santoro, who did not comment and then "simply moved on to the next business topic in the conference call."  (J.A. 158-59).  Santoro's initial silence is suspect.  Pregnancies are usually met with congratulatory words, even in professional settings.  When people work together they develop relationships beyond the realm of employment, and Asmo's pregnancy was particularly noteworthy given that she was pregnant with twins, a fairly unusual (and overwhelming) occurrence. . . .

[8] Keane's argument that there are other possible explanations for Santoro's silence is correct and well-taken.  However, in the context of summary judgment, where we examine the evidence in the light most favorable to the non-moving party, we believe that Asmo's argument is sufficient to call into question Santoro's motives.  Santoro's silence is evidence of pretext because it can be read as speculation regarding the impact of Asmo's pregnancy on her work, and an employer's speculation or assumption about how an employee's pregnancy will interfere with her job can constitute evidence of discriminatory animus.

*Asmo v. Keane, Inc.,* 471 F.3d 588, 594-95 (6th Cir. 2006) (citations omitted).

Hawthorne responds that she did, in fact, congratulate Majer on her pregnancy.  That, however, merely raises an issue for the trier of fact.

In sum, Majer has raised substantial doubts about the relative weight accorded to new growth and sales from old accounts in evaluating sales representatives, the extent to which Lexion relied on sales as opposed to other factors in evaluating and rewarding sales representatives, and whether she was treated differently than other similarly-situated sales representatives.  Moreover, Majer's account of Hawthorne's response to

the news of Majer's pregnancy, which this court must credit in deciding this motion, is significant evidence regarding the issue of discriminatory animus.  Looking at the evidence in the light most favorable to Majer, a reasonable jury could conclude that Lexion's reasons for firing Majer are pretextual.  As Majer has successfully assumed her burden of establishing a *prima facie* case of discrimination and has presented evidence sufficient to allow a reasonable jury to conclude that Lexion's asserted legitimate reasons for terminating Majer are pretextual, Lexion's motion for summary judgment should be denied.

                                                              IV

       For the reasons given above, Lexion's motion for summary judgment should be denied.  Majer's motion to strike, therefore, should be dismissed as moot.


Date:  June 9, 2010                              */s/ Nancy A. Vecchiarelli*
                                                 United States Magistrate Judge

## OBJECTIONS

       **Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**