UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

TONI MAJER,                               )
                                          )    CASE NO. 1:09CV00836
            Plaintiff,                    )
                                          )
      v.                                  )    JUDGE BENITA Y. PEARSON
                                          )
LEXION MEDICAL, LLC,                      )    **ORDER ADOPTING IN PART,**
                                          )    **MODIFYING IN PART THE**
            Defendant.                     )    **MAGISTRATE JUDGE'S REPORT**
                                          )    **AND RECOMMENDATION AND**
                                          )    **DENYING DEFENDANT'S MOTION**
                                          )    **FOR SUMMARY JUDGMENT AND**
                                          )    **DISMISSING PLAINTIFF'S MOTION**
                                          )    **TO STRIKE.**
                                          )    [Resolving ECF Nos. 43, 64, and 70]


## I.  Introduction

Before the Court is the Report and Recommendation (ECF No. 69) filed by Magistrate

Judge Nancy A. Vecchiarelli recommending that the Court deny the Motion for Summary

Judgment (ECF No. 43) filed by Defendant Lexion Medical, LLC ("Lexion") and dismiss as

moot the Motion to Strike Improper Evidentiary Material (ECF No. 64) filed by Plaintiff, Toni

Majer ("Majer").  Lexion  has filed objections to the Report and Recommendation (ECF No. 70),

to which Majer has responded (ECF No. 76).  For the reasons set forth below, the Magistrate

Judge's Report and Recommendation is adopted, in part, and modified, in part.  Lexion's motion

for summary judgment is denied.  Majer's motion to strike is dismissed as moot.

(1:09cv00836)

## II. **Standard of Review**

The standard of review for evaluating a Report and Recommendation is set forth in 28 U.S.C. § 636. The Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* § 636(b)(1)(C). The Court "may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id*.

## III. **Background**

The Report and Recommendation accurately details the facts and procedural history of the case. Those facts and history, to which neither party has objected, are restated herein.

Lexion produces medical devices for sale to physicians and medical institutions. Lexion's sales representatives sell these devices. Majer applied for a sales representative position with Lexion in May 2006. Three regional sales managers ("RSMs") interviewed her for the job: Mark Jarboe ("Jarboe"), Lori Larson ("Larson"), and Karen Hawthorne[1] ("Hawthorne"). During these interviews, Larson and Hawthorne allege that they told Majer that the success of sales representatives was measured by the new accounts they obtained. On May 10, 2006, Lexion sent Majer a letter offering her a job as a sales representative and outlining certain terms of her employment. Deposition of Majer, Exh. 55, Doc. 7. These terms included her base salary, commission structure, growth requirements, bonus schedule, territory history, and territory projections. The letter also indicated that Lexion expected Majer to produce $100,000.00 in growth and that this goal must be met before she would earn commissions.

Majer accepted Lexion's job offer. Lexion gave Majer 1½ days of training, during which she was told that the average learning time for persons without previous medical sales experience was three to four months. Majer was primarily responsible for selling Lexion's Insuflow device. Her job included exploring sales leads, cold calling potential buyers in her territory, visiting current users of the Insuflow, finding out why past users were no longer using the device, and, particularly, working in the operating room with physicians to demonstrate how the device was used. Majer worked with Hawthorne or Jarboe on five

---

[1] Hawthorne is Majer's direct Supervisor. ECF No. 72.

(1:09cv00836)

occasions to help her learn how to market and demonstrate the Insuflow.  She also worked with or shadowed other successful sales representatives to learn how they worked to sell the device.  In addition, Majer received tips and leads from the RSMs regarding how to support current customers, how to find and research new customers, and where likely sales could be found.

Majer had regular feedback regarding her sales status and performance. All sales representatives, including Majer, received bi-monthly sales reports that summarized the status of ongoing accounts, new sales, and progress toward sales goals.  Once a month, sales representatives also received commission statements. These statements summarized the representative's sales each month in dollar amounts, whether the representative was meeting sales goals, and whether the representative had any bonus accounts.  Majer secured her first new account in August, 2006.  She did not meet her goals for new sales in any month in which Lexion employed her.

Majer contends that she received consistently positive communications from Hawthorne during 2006.  Majer cites these communication as examples of positive communications:

- June 7, 2006, e-mail message, "love, love, love": "WOW… This visit to Cleveland has completely reinforced why we chose you as THE candidate."15

- August 7, 2006 "Your success": "You are doing a great job networking and putting things together in your territory. . . . Keep up the great attitude and determination. Your first new account is just around the corner!"

- August 21, 2006 "Follow Up 8-21-06": "It looks like things are beginning to take shape for you… again, congratulations on securing your first new account! It is very apparent that you have been hitting the pavement and have been making many connections within the community . . . . The connections you have made thus far are working for you. Keep up the great work!"

- October 3, 2006, "October is your month!": "I can feel it."

- October 6, 2006, "thanks": "for keeping your expenses in check. Love it!"

Opposition Brief at 2-3 (footnotes omitted).

3

(1:09cv00836)

On January 5, 2007, Majer received the following e-mail from Hawthorne accompanied by an attachment describing Majer's 2007 Compensation Plan:

Toni--Congratulations on a successful 2006!  We are looking forward to accelerating the pace for 2007 and we are confident that this will be your break out year!  Remember, because of your start date in 2006, you are eligible for Rookie of the Year 2007.  We have attached your 2007 Comp Plan with this email.  Please let us know if you have any questions.  Good luck in 2007!

P.S. We have determined your compensation for 2006 as $35,077 (regular pay, holiday pay and PTO from hire date- Dec.30th) plus $5,194.80 in commission to equal $40,272.  This does not include your new account bonuses of $1,500.00 which would bring a grand total of $41,772.  During a full calendar year this equates to $66,695.)

2007 Benefits enclosed also.

Deposition of Majer, Pt. I, Exh. 50 (punctuation in original).  The attached commission plan indicated that Majer had achieved $20,627 of new growth in 2006, about 20% of the goal that had been set for her.  It also projected new account growth for 2007 as $150,000.00.  Such growth, when combined with existing accounts, would have resulted in $380,633.00 of total sales for 2007, or about $27,655.00 per month, with old accounts representing almost $17,000 of that number.

According to Lexion, two questions from Majer in January 2007 indicated to Hawthorne that Majer was having difficulty understanding basic concepts and procedures related to the Insuflow.  Hawthorne and the other RSMs began discussing concerns regarding Majer's performance.

Majer's sales figures for January and February 2007 were $19,995.00 and $18,159.00, respectively.  Deposition of Majer, Exh. 103.  A handwritten note from the end of February 2007 indicates that Majer understood that she needed total sales of $27,535.00 per month during 2007 to meet her sales goals.[2]  Deposition of Majer, Exh. 104, p. 3.

---

[2]  As noted earlier, the attachment to Majer's January 5, 2007 e-mail gave the monthly goal as $27,655.00.  The relatively minor discrepancy between that figure and the figure that Majer jotted down at the end of February is not explained in the record.

4

(1:09cv00836)

Majer continued to receive training from Hawthorne.  In March, Hawthorne told Majer that she needed to spend less time in the office and more time in the operating room and that she needed to take a more focused approach to her leads.  Majer failed to follow up on an in-service call she made with Hawthorne, despite Hawthorne's directive to do so.

On April 27, 2007, Jarboe sent an e-mail to all territory sales representatives naming the top two sales representatives on the basis of sales for the first quarter of 2007.  Deposition of Majer, Exh. 63.  The e-mail also gave each representative a ranking out of 21.[3]  Majer's ranking was 18th.  Lexion alleges that only new sales representatives ranked lower than Majer.

On May 2, 2007, Hawthorne e-mailed all her sales representatives, asking them to provide examples of what they say when trying to promote Insuflow, without sounding "clinical."  On May 11, 2007, having received Majer's response to the e-mail, Hawthorne e-mailed the following to Majer:

> Toni- This is exactly right.  However, . . . we want to work on "casual lingo."  This response sounds very scripted . . . right from the textbooks. Can you re-read the comments that are going around and see the difference between those and this?

> The casual lingo we are referring to seems to be better received by the nurses and drs because they can truly relate to it.  And those who are using it in the field are having more success.

> Try to work on your casual lingo and begin incorporating it into your sales calls instead of the mechanical answers which can come across as monotone and uninteresting.

> Your audience will be more engaged, entertained, and more passionate about the Insuflow benefits which will lead to more sales.

> Let me know if you have questions regarding where we are going with this . . . thanks.

Deposition of Majer, Exh 68.

On May 17, 2007, Hawthorne and Majer discussed two studies related to

---

[3]  A handwritten note on the copy of the e-mail in the record indicates that the proper number is 22.  The author of the note is unknown.

(1:09cv00836)

recovery time and reduction of bowel obstruction.  Four days later, Majer e-mailed Hawthorne asking for the same information that the two had reviewed on the 17th.  After an additional e-mail from Majer indicating that she was unclear about the studies, Hawthorne e-mailed in relevant part:  "Toni, You should know the Ott one by heart…. And know the key points….! After you get home and have internet access, re-read the Ott[4] study from 1999…"  Deposition of Hawthorne, Pt. II, Doc. No. 58, Exh. OOO.  Lexion contends that these exchanges show that Majer apparently did not understand studies she had first been given a year earlier.  Deposition of Hawthorne, Pt. II at 192-94.

From May 22, 2007 through May 24, 2007, Majer attended field training with Mike Kirkpatrick ("Kirkpatrick"), a Michigan sales representative.  Upon completion of the training, Majer told Hawthorne that she was doing everything that Kirkpatrick had done and that she had not learned anything new.  Kirkpatrick, however, reported to Hawthorne and Jarboe that Majer was not confident when talking about the Insuflow to an audience.  Kirkpatrick said that she was flustered when talking to surgeons, was hesitant, had many questions, and apparently did not grasp the selling points of the Insuflow.  Kirkpatrick had been hired one month after Majer.

During the training with Kirkpatrick, Hawthorne and Majer exchanged e-mails.  In one of the e-mails, Majer expressed confusion about the term "4 arms of 11," meaning four groups of patients.  Lexion alleges that because of this, Hawthorne became concerned that Majer did not know what the term meant, as is was one that was frequently used and to which Majer had been introduced a year earlier.

Hawthorne, Jarboe, and Larson allege the following.  On May 24,[5] 2007, the RSMs conferred regarding Majer.  They discussed ending Majer's employment, something that they had discussed previously. Among other things, they reviewed the following information regarding Majer's sales performance compared to her sales goals:

---

[4]  Douglas E. Ott was Lexion's medical director.

[5]  The date may have been May 23, 2007.  Testimony about the exact date is contradictory.

(1:09cv00836)

| Month | Goal | Sales Performance |
|---|---|---|
| July 2006 | $25,833.33 | $12,798.00 |
| August 2006 | $25,833.33 | $23,400.00 |
| September 2006 | $25,833.33 | $15,069.00 |
| October 2006 | $25,833.33 | $16,914.00 |
| November 2006 | $25,833.33 | $18,828.00 |
| December 2006 | $25,833.33 | $23,514.00 |
| January 2007 | $27,552.75 | $19,995.00 |
| February 2007 | $27,552.75 | $18,159.00 |
| March 2007 | $27,552.75 | $21,153.00 |
| April 2007 | $27,552.75 | $17,793.00 |
| May 2007 | $27,552.75 | $25,056.00 |

Deposition of Majer, Exh. 103 at 1, 8.[6]  They also noted that Majer had lost some previously-established business, had difficulty with basic concepts related to the Insuflow, and was not spending enough time in the operating room. Consequently, they decided to terminate Majer.  They also decided to continue her through the second quarter, with an effective termination date of July 10, 2007.  After this discussion, the RSMs allegedly telephoned Shelly Amann, their supervisor, and, later, Dr. Ott, Lexion's medical director regarding their decision to terminate Majer.

Majer did not attend a conference call scheduled for May 30, 2007.  On June 15, 2007, Hawthorne and Majer participated in a conference call during which Hawthorne told Majer that she had not improved her sales performance. On June 18, 2007, Majer telephoned Hawthorne and told her that she had sprained her ankle over the weekend and that she was pregnant.  Hawthorne alleges that

---

[6] Plaintiff erroneously objects to the use of the chart as "evidence."  The chart is not evidence.  The citations accompanying the chart in Lexion's brief, including the citations to Deposition of Majer, Exh 1, are evidence for the veracity of the numbers in the chart.  Whether those numbers are expressed in Lexion's brief as paragraphed text or as a chart is an irrelevancy.

7

(1:09cv00836)

she congratulated Majer on her pregnancy; Majer alleges that Hawthorne did not congratulate her.  Instead, according to Majer, Hawthorne noted that another sales representative had also said that she was pregnant and asked, "What are we going to do about that?"

On June 26, 2007, Hawthorne completed Majer's separation notice. Majer's sales numbers for June 2007 were $14,448.00, an amount more than $13,000.00 below her sales goal.  Majer had not used an Insuflow sample during the month of June.  Majer's sales for the first half of 2007 were $116,604.00, reflecting a decrease from her sales in the last half of 2006, $129,882.00.

Hawthorne and Majer met on July 10, 2007 in Westlake, Ohio. Hawthorne told Majer that her employment was not working and that she was being terminated.  Hawthorne collected the property Lexion had given Majer, including a laptop computer and a car, and arranged for a car to bring Majer home.

According to Hawthorne, when she returned to the office, she found a number of personal items that had been left in the case containing the laptop. These included note pads, pens, paper clips, rubber bands, and two packets of pills.  Hawthorne testified that the pills had Majer's name and address on them and that four or five pills on one of the packages had been punched out.  She told Katie Pavleck ("Pavleck") to send them to Majer.  Pavleck sent them to Majer by Federal Express with an enclosed note, "Karen wanted me to send you these. Thanks, Katie."  Hawthorne also testified that Majer had told her earlier that she had been using birth control pills until she decided to become pregnant.  Majer later produced birth control pills she alleged she had received in the mail from Lexion, but those pills were identified as belonging to Jian Tang ("Tang"), and the prescription had been filled at a pharmacy in Avon Lake, Ohio.  Tang flew out of Cleveland on July 10, 2007 on the same flight that Hawthorne had taken to leave Cleveland.  The pills had been placed in an outer pocket of her backpack which, like Hawthorne's computer case, had been "gate checked" before boarding the flight.  Tang testified that both of her packages of pills had been full.  Hawthorne denied that the pills produced later by Majer were the pills she had asked Pavleck to send to Majer.

On July 18, 2007, Majer's attorney sent Lexion a letter advising it of Majer's claims and protesting what counsel believed to be harassment directed at Majer by sending the birth control pills to her.  Majer filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 10, 2007, alleging gender and pregnancy discrimination.  Majer received a right to sue letter from the EEOC on December 3, 2008.

8

(1:09cv00836)

On February 26, 2009, Majer filed this action against Lexion in state court. Lexion removed the case on April 13, 2009.  Majer alleges impermissible gender and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k).  Lexion now moves for summary judgment.

ECF No. 69 at 2-10.

### IV.  The Pregnancy Discrimination Act and McDonnell Douglas Standard

The Pregnancy Discrimination Act of Title VII prohibits sex-based discrimination on the basis of pregnancy.  42 U.S.C.A. § 2000e(k).  Specifically, when the Pregnancy Discrimination Act was codified in 1978, Congress amended Title VII by clarifying that the terms "because of sex" or "on the basis of sex" include, but are not limited to, "because of or on the basis of pregnancy, childbirth, or related medical conditions."  *Id.*  Women affected by pregnancy, childbirth, or related medical conditions must be treated the same for all employment-related purposes.  *Id.*  Furthermore, women affected by such conditions are required by Title VII to be treated the same for all employment-related purposes as other persons who are not affected, but who have a similar ability or inability to work.  *Id.*

In the absence of direct evidence of discrimination, the Court is instructed to conduct the familiar *McDonnell Douglas* burden-shifting framework to analyze Title VII-pregnancy discrimination claims.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000).  First, underneath the *McDonnell Douglas* framework, an employee must put forth a prima facie case of pregnancy discrimination by demonstrating "that (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment

(1:09cv00836)

decision, and (4) there is a nexus between her pregnancy and the adverse employment decision."
*Cline*, 206 F.3d at 658.  If the employee is able to present such a case, then the burden shifts to
the employer to provide a legitimate, non-discriminatory reason for its adverse employment
decision.  *Id*.  If the employer proffers a legitimate, nondiscriminatory reason for the adverse
employment action, the burden shifts back to the employee, who, in order to defeat a motion for
summary judgment, must show that the employer's articulated reason was a pretext for
intentional discrimination.  *Id*.; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.
133, 142-43 (2000) (holding that prima facie case and sufficient evidence of pretext may permit
trier of fact to find unlawful discrimination, without additional, independent evidence of
discrimination, though such showing will not always be adequate to sustain jury's finding of
liability).

## V. **Analysis**

Because there appears to be no dispute as to whether the first two inquiries of the
*McDonnell Douglas* framework were met–as evidenced by the Magistrate Judge's findings–(a)
Majer established a prima facie case of discrimination (ECF No. 69 at 18); and (b) Lexion
articulated a legitimate and nondiscriminatory reason for terminating Majer (ECF No. 69 at
18)–the disposition of this case ultimately hinges upon resolving the final inquiry in the
framework–whether Majer presented sufficient evidence from which a jury could reasonably
conclude that Lexion's non-discriminatory reason for terminating Majer was merely a pretext for
discrimination.

10

(1:09cv00836)

Lexion argues to the contrary and has raised three objections to the Report and Recommendation–all of which criticize the Magistrate Judge's finding that Majer succeeded in meeting her burden to establish pretext.  ECF No. 70.  First, Lexion asserts that the Magistrate Judge incorrectly concluded that there was a genuine issue of material fact as to whether Majer performed poorly.  ECF No. 70 at 3-5.  Second, Lexion refutes the Magistrate Judge's holding that there was sufficient evidence supporting Majer's contention that she was treated differently from similarly situated sales representatives.  ECF No. 70 at 5-8.  Lastly, Lexion alleges that Majer's supervisor's failure to react positively when discovering Majer's pregnancy was insufficient evidence to establish pretext.  ECF No. 70 at 8.

While not categorized as an objection, Lexion also criticizes the Magistrate Judge's failure to apply the "honest belief" rule, articulated in *Smith v. Chrysler Corp*., 155 F.3d 799, 806-08 (6th Cir. 1998), when determining that Majer had met her evidentiary burden in demonstrating discriminatory animus.  ECF No. 70 at 2-3.  The rule is proffered as an additional reason to rule in favor of Lexion's Motion for Summary Judgment.

The Court will address each of Lexion's objections below, as well as Lexion's averment that it is entitled to summary judgment in light of the "honest belief" rule.

### A.  Pretext

The Sixth Circuit Court of Appeals has held that a plaintiff can demonstrate pretext, *i.e.*, rebut the legitimate and non-discriminatory reason articulated by her employer "by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B.*

11

(1:09cv00836)

*Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

The first rebuttal test that a plaintiff can satisfy "is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are factually false." *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (citing *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1123-24 (7th Cir. 1994)) (emphasis and quotation marks omitted).  The third rebuttal test "is also easily recognizable and, ordinarily, consists of evidence that other employees . . . not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084.  The Sixth Circuit has explained that the first and third tests are generally grouped together because they are both "direct attacks on the credibility of the employer's proffered motivation for firing [the employee] and, if shown, provide an evidentiary basis for what the Supreme Court has termed 'a suspicion of mendacity.' " *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007) (quoting *St. Mary's Honor Center v. Hicks*, 113 S. Ct. 2742, 2749 (1993)).

The second rebuttal test, "by contrast, 'is of an entirely different ilk' because 'the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal.'" *Jones*, 488 F.3d at 406 (quoting *Manzer*, 29 F.3d at 1084) (emphasis in original).  The plaintiff indirectly attacks the credibility of the proffered legitimate non-discriminatory reason. *Manzer*, 29 F.3d at 1084.  "In such cases . . . the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.*

12

(1:09cv00836)

A review of the Report and Recommendation reveals that the Magistrate Judge did not cite the test articulated in *Manzer* when she determined that Majer met her burden establishing pretext.  Therefore, the Court modifies the Magistrate Judge's analysis to comport with the *Manzer* guidelines and, ultimately, adopts the Magistrate Judge's conclusions, albeit for different reasons.

Applying the principals espoused in *Manzer* to the instant case, the Court finds that Majer introduced sufficient evidence from which a reasonable juror could find that Lexion's proffered explanation for terminating Majer was not credible under either the second or third rebuttal test.[7]

This revelation leads the Court to address Lexion's first objection to the Report and Recommendation, wherein Lexion argues that it is undisputed that Majer performed poorly as evidenced by her failure to meet her sales goals.  Lexion contends that "the documents proffered by Majer clearly show she failed to meet her new sales performance goals."  ECF No. 70 at 3. Lexion further states "that there was no dispute [to the ] fact that [Majer] did not once in any month of employment ever meet [her] sales figures."  ECF No. 70 at 4.

As argued by Majer, "Lexion's argument misses the point."  ECF No. 76 at 5.  The question for the Court to resolve, under either the second or third rebuttal test articulated in *Manzer*, is not whether a reasonable juror could conclude that Majer failed to meet her new sales goals.  Rather, the Court's inquiry hinges upon whether Majer's failure to meet her new sales

---

[7] Although Majer maintains that Lexion's stated reason for terminating her is false (ECF No. 60 at 34), she concedes that she failed to meet the sales goals established by Lexion.  ECF Nos. 76 at 5 and 60 at 19-21.  Because there is at least some factual underpinning to Lexion's proffered explanation for terminating Majer, analyzing Majer's evidence of pretext under the first test is foreclosed.  *See Manzer*, 29 F.3d at 1084.

(1:09cv00836)

goals was either the impetus behind Lexion's decision to terminate her employment or sufficient to warrant terminating her employment.  Under both the second and third rebuttal tests, Majer's perceived inadequacies to meet her sales quotas are irrelevant.  Lexion's objection is, therefore, overruled.

In support of proving that Majer's inability to meet her sales goals was neither the impetus for her termination or sufficient to warrant such severe action, the record reveals that there are genuine issues of material facts with respect to (1) the actual criteria used by Lexion to evaluate its sales representatives, and (2) whether similarly situated employees, outside of the protected class, were treated differently.  Additionally Majer's report of Lexion's reaction to the news of her pregnancy serves as additional evidence in proving pretext.

### 1.  Criteria for Evaluating Employees

As a preliminary matter, the record reflects that Majer has cast doubt upon the actual criteria used by Lexion to evaluate the performance of its sales representatives.  According to Lexion, the ability to grow sales, *i.e.* "new growth", with respect to new sales accounts was the primary measure of a sales representative's performance.  ECF Nos. 69 at 18-19; 70 at 3-4.  Majer, however, has maintained that Lexion's true and utilized criterion in evaluating the performance of its sale representatives is the achievement in combined sales, which includes not only those sales related to "new growth" of new accounts, but also those sales garnered from pre-existing accounts.  ECF Nos. 69 at 20 and 76 at 4-5.

Majer's position is persuasive.  As the Magistrate Judge aptly pointed out, documentation prepared by Lexion catalogs Majer's sales performance by conflating "new growth" sales figures

14

(1:09cv00836)

with those from pre-existing accounts.  ECF No. 69 at 23-24.  For example, in Lexion's Motion

for Summary and its accompanying attachments, Lexion presented to the Court a chart

illustrating Majer's alleged lackluster performance by conflating the two criteria.  ECF Nos. 43 at

22;43-6 at 34-48; and 43-9 at 70.  Additionally, in a document submitted to the EEOC in the

course of the agency's investigation, Lexion also merged the criteria when determining Majer's

rank within the sales department.  ECF No. 57-13.  While Lexion has stated that the document

given to the EEOC "provides a very imprecise view of the actual performance of all the sales

reps" (ECF No. 62 at 1), its explanation rings hollow given that Lexion has, on at least more than

one occasion, used Majer's stated criteria when displaying the relative achievement of its staff.

 The Magistrate Judge also found an inconsistency between Lexion's averment of its

policy regarding granting commissions to its sales staff and its practice of doing so to be further

evidence that Lexion's criteria for judging sales representatives' performance encompassed not

only "new growth", but pre-existing sales, as Majer reports.  The Magistrate Judge stated:

> The conflict between this document [prepared for the EEOC] and the various
> Compensation Plans regarding what constitutes 'sales goals' at Lexion is made more
> acute because Lexion avers that no sales representatives was to receive commissions
> until he or she achieved the new growth achievement goal set for that year.  Yet,
> although Majer failed to achieve her new growth goal, she received commissions for
> her work in 2006, as described in her 2007 Compensation Plan.

ECF No. 69 at 23.

Lexion criticizes the Magistrate Judge for attributing any significance to its compensation

plan or Majer's receipt of commission on the basis that the Magistrate Judge's assessment of its

compensation plan was grossly misguided.  Lexicon refutes the Magistrate Judge's finding that

receipt of commissions is only conditioned upon the achievement of "new growth" goals by

15

(1:09cv00836)

explaining: "a sales rep receives [additional] commissions on all existing sales, whether the sales

rep made the sales or not. That is how they receive their base salary."  ECF No. 70 at 7.

To the extent that the Magistrate Judge incorrectly characterized Lexion's compensation

plan, Lexion's objections are sustained.  It appears, however, that the Magistrate Judge placed

emphasis on this inconsistency to not only call into question Lexion's credibility, but also to

illuminate the incongruous nature of Lexion's position.  If Lexion's averment–that the criterion

of importance is only the measure of "new growth" and not performance related to combined

sales–is to be believed, it appears nonsensical that sales representatives, like Majer, would still be

rewarded and receive commissions for the less valued work associated with pre-existing

accounts.  The Magistrate Judge's finding has merit.

Viewing the facts in the light most favorable to Majer, the non-moving party, the Court

agrees that Lexion's Compensation Plan can legitimately be construed to support Majer's

position that a sales representative's ability to maintain existing accounts was also taken into

consideration when evaluating performance.

With respect to proving pretext as discussed in *Manzer*, the uncertainty of Lexion's actual

criteria in evaluating its sales representatives most certainly can be viewed as evidence indirectly

attacking the credibility of Lexion's legitimate non-discriminatory reason under the second

rebuttal test.  *See Manzer*, 29 F.3d 1084.  Lexion's inconsistent position and conflicting

documents undoubtedly shadows Lexion's credibility.  Debate on this issue becomes most

significant when determining, whether similarly situated employees outside of the protected class

were subjected to different treatment, in support of proving pretext under the third rebuttal test,

16

(1:09cv00836)

as discussed below.  *Id*.

### 2.  **Treatment of Similarly Situated Employees**

The Magistrate Judge concluded that Majer had presented sufficient evidence to raise an

issue for the trier of fact to determine whether Majer had been treated differently than other

similarly situated sales representatives.  The Magistrate Judge's analysis focused primarily on

three individuals believed to be similarly situated–Wilson, Kirkpatrick and Spearman, who

shared the same supervisor as Majer, and whom Majer alleged had all performed worse than

Majer but did not suffer the same fate.  ECF No. 69 at 20-25.

When analyzing the treatment of Spearman compared to that of Majer, the Magistrate

Judge acknowledged Lexion's concession that Spearman performed worse than Majer but had

not been terminated.  The Magistrate Judge did not, however, opine as to whether the dissimilar

treatment of Spearman bode well for Majer's argument.  ECF No. 69 at 24-25.  With respect to

Wilson, the Magistrate Judge found that Wilson's poor performance and his termination by

Lexion "more than six months" after Majer's "offers marginal, if any, support for" Lexion's

contention that Majer was fired for reasons unrelated to her pregnancy.[8]  ECF No. 69 at 24,

FN13.

In regard to Kirkpatrick, however, the Magistrate Judge found Lexion's perceived silence

concerning Kirkpatrick's performance and continued employment compared to the treatment

---

[8]  The Magistrate Judge mistakenly understood that Wilson was hired after Majer (ECF
No. 69 at 24, FN13); this is not true.  ECF No. 57-13.  This mistake appears to have caused the
Magistrate Judge to incorrectly conclude that the Lexion's treatment of Wilson was consistent
with its treatment of Majer and explains why, given the later state date, why Wilson would not
have been terminated at the same time as Majer.

17

(1:09cv00836)

accorded Majer to be "particularly problematic" and quite damaging to Lexion's position.  ECF No. 69 at 25, FN14.  The Magistrate Judge observed that "Lexion says nothing about Majer's allegations regarding Kirkpatrick."  ECF No. 69 at 25.

In its second objection to the Report and Recommendation, Lexion avers that similarly situated employees were not treated differently and refutes the Magistrate Judge's finding that Lexion failed to explain or provide comparative evidentiary support regarding Kirkpatrick's performance.  ECF No. 70 at 5-6, Footnote 9 and 10.  In support of its argument, Lexion guides the Court to Exhibit B, attached to its motion for summary judgment,[9] which contains documents demonstrating that Kirkpatrick performed substantially better than Majer in the area of new growth.  ECF No. 43-8 at 99-102.

To the extent the Magistrate Judge's conclusion was primarily based upon an erroneous assumption–that Kirkpatrick was a true comparative whose performance was the same as or worse than Majer's in the area of new growth and whom was not subjected to similar treatment–Lexion's objection is sustained on this point.  After a *de novo* review of this issue, the Court, nevertheless, concurs with the Magistrate Judge's finding that there are genuine issues of material fact with respect to whether similarly situated employees were treated differently.  Moreover, the record supports a finding of pretext under the third rebuttal test identified in *Manzer*.

When the facts are viewed in a light most favorable to the non-moving party, which requires the Court to analyze the performance of Lexion's sales representatives based upon

---

[9] Exhibit B was appropriately submitted for the Magistrate Judge's review, a point accurately made by Lexion's counsel.  ECF No. 70 at 5-6, FN 9.

(1:09cv00836)

Majer's espoused criteria–complete sales–the record reveals that Majer performed better than several of Lexion's other sales representatives who were permitted to continue employment.  For instance, Wilson, Kirkpatrick, and Spearman–all reporting to Majer's supervisor, Hawthorne–performed worse than Majer but were not terminated for their performance.[10]  ECF No. 60 at 26.

Of greater significance is that, when analyzing the performance of Lexion's sales representatives using Lexion's stated criteria of examining only "new growth" figures, there are at least two individuals–Spearman and Dunn–who did not exceed Majer's "new growth" sales and were treated differently.[11]

Lexion has explained the dissimilar treatment of Spearman compared to Majer, by emphasizing that Spearman was (a) the daughter of the owner of the company and (b) was transferred out of sales based due to poor performance.  ECF Nos. 70 at 6 and 62 at 6-7.  Given

---

[10]  In comparing the sales figures of Majer's co-workers to that of Majer, the Court used the documentation identified by Majer.  ECF No. 60 at 26, Footnotes 131-137.

In addition to supporting Majer's position that she performed better than her co-workers, the Court's analysis raises additional credibility concerns. There appears to be inconsistencies in the reported sales figures for some of the sales representatives.  For instance, one of the documents state that Kirkpatrick's complete sales for 2006 was $279,339.  ECF No. 58-63 at 4.  Another document indicates that Kirkpatrick total sales for that year were $161,193.  ECF No. 58-63 at 3.  There is also an inconsistency for the sale figures of another co-worker–Dunn.  One document indicates that his total sales for 2006 were $50,400 (ECF No. 52-6 at 10) which conflicts with a spreadsheet indicating that his total sales were $22,360. (ECF No. 52-6 at 16).  Majer has also highlighted additional discrepancies in the sales data.  ECF No. 60 at 26-28.

The Court concludes that these inconsistencies provide further justification for denying Lexion's Motion for Summary Judgment.

[11]  For 2006, Majer's actual "new growth" figure was $20,627.  ECF No. 62-2 at 31.  Spearman and Dunn's figures for the same time period were $13,530 (ECF No. 58-68 at 11) and $15,150 (ECF No. 52-6 at 10), respectively.  Both Spearman and Dunn were not, however, terminated by Lexion.  ECF No. 70 at 6.

19

(1:09cv00836)

Spearman's familial relationship to the owner and the lack of evidence casting doubt upon this relationship, a reasonable juror could attribute the difference in treatment to nepotism, which is not actionable under Title VII.  *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1096 (6th Cir. 1996) (finding allegations of nepotism, even if proven, would not constitute evidence of impermissible  discrimination under Title VII).

By contrast, Lexion's treatment of Dunn cannot be so easily dismissed.  Lexion has argued that Dunn "was not similarly situated, as he was not supervised by [Majer's supervisor]" (ECF No. 72 at 1), the Court disagrees.  The Sixth Circuit has made it clear that a mere "difference in supervisors . . . does not make the employees dissimilarly situated."  *Gibson v. Shelly Co.*, 314 Fed. Appx. 760, 770 (6th Cir. 2008).  Considering that Lexion has conceded that all of the sales representatives' supervisors "are equally involved in the hiring, training, and termination of the sales reps" (ECF No. 43 at 8), Dunn would still be an appropriate comparative.[12]  *See id.* at 771 (finding that the district court was in error by focusing on the identity of the plaintiff's supervisor when identifying similarly situated individuals because the termination decision was made by a committee).

### 3.  Reaction to Pregnancy Announcement

In its final objection, Lexion avers that the Magistrate Judge erroneously held that the mere silence of Majer's supervisor, Hawthorne, was sufficient to establish pretext.  ECF No. 70

---

[12]  The Court also finds it compelling that while Dunn was plagued with poor performance throughout his employment, Lexion did not terminate his employment.  A document relied upon by Lexion to show Majer's poor sales figures shortly before she was terminated in mid-2007 ironically demonstrates that Dunn continued to perform poorly even near Majer's termination date.  ECF No. 57-13.

(1:09cv00836)

at 8.  Although Lexion acknowledges that in *Asmo v. Keane, Inc.*, 471 F.3d 588, 594-596 (6th Cir. 2006), the Sixth Circuit found that an employer's silent response to an employee's pregnancy announcement could constitute evidence supporting pretext, Lexion argues that this evidence, by itself, would be insufficient to make a showing of pretext.  In support of its argument, Lexion distinguishes *Asmo* from the instant case by highlighting that in *Asmo*, "silence of a supervisor was one among many reasons a reasonable jury could have found pretext. [But in the case at hand], the silence of [Majer's supervisor] is the only proffered evidence of pretext." ECF No. 70 at 8.

The Court need not decide whether *Asmo* permits an employer's silence to be independently sufficient to raise an issue of fact on a finding of pretext because Lexion's entire argument is premised on a faulty finding.  Contrary to Lexion's objection, the Magistrate Judge did not rely solely upon the silence of Majer's supervisor when concluding that Lexion's legitimate and non-discriminatory reason had been compromised.  As discussed above, there are genuine issues of material fact as to (1) the criteria used by Lexion in evaluating the performance of its employees, (2) whether Majer performed poorly, and (3) whether she was treated differently than other similarly situated sales representatives.  These factors were all articulated by the Magistrate Judge in recommending the denial of Lexion's Motion for Summary Judgment. ECF No. 69 at 18-27.  Lexion's objection is, therefore, overruled.

The Court concurs with the Magistrate Judge's ultimate findings and concludes that Majer's report of Lexion's response to her pregnancy is additional circumstantial evidence supporting pretext under the second rebuttal test identified in *Manzer*.

21

(1:09cv00836)

### B. **Honest Belief Rule**

Lexion also complains that Majer was required to put forth evidence that demonstrates that Lexion did not "honestly believe" in its proffered legitimate, non-discriminatory reason for her termination.  ECF No. 70 at 2-3.  Lexion states that because she failed to meet this burden, the Magistrate Judge erred in finding in favor of Majer as a matter of law.  ECF No. 70 at 2-3, and 7-8.

In support of its position, Lexion relies upon Sixth Circuit precedent which holds that an employer may defeat an employee's claim of pretext by showing that "the employer honestly believed in the proffered reason given for its employment action." *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998).  The employer's belief must be reasonably grounded on "particularized facts that were before it at the time the decision was made" in order for an employer's proffered reason to be considered honestly held.  *Id.* at 807.  And, even if the employer makes such a showing, the employee may produce proof to the contrary, thereby rebutting the protection afforded by the rule.  *Id.*

Applying this standard to the present case, the Court readily concludes that Lexion has met its burden of pointing to "particularized facts" underlying its decision to terminate Majer's employment.  As discussed above, Majer has presented sufficient evidence that casts serious doubts upon the documents Lexion submitted in support of its decision to terminate Majer and Lexion's decision-making process in general.  The record before the Court indicates that a jury could reasonably reject Lexion's averment that Majer had been terminated for poor performance and infer that Lexion did not honestly believe in its proffered reason.  Accordingly, granting

22

(1:09cv00836)

Lexion's Motion for Summary Judgment based upon its "honest belief" that Majer was a poor

performer is inappropriate.

## VI.  Conclusion

For the foregoing reasons, the Magistrate Judge's Report and Recommendation is

adopted, in part, and modified, in part.

Lexion's Motion for Summary Judgment is denied (ECF No. 43) and Majer's Motion to

Strike Improper Evidentiary Material (ECF No. 64) is dismissed as moot.

This matter has been set for trial on November 7, 2011 at 9:00 a.m. and final pretrial on

October 19, 2011 at 10:30 a.m.


IT IS SO ORDERED.


June 1, 2011                                        _/s/ Benita Y. Pearson___
Date                                                Benita Y. Pearson
                                                    United States District Judge